1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

E-Filed: 06.30.11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIGRAN CHOLAKYAN, individually and behalf of all others similarly situated,<br><br>   Plaintiff,<br><br>  vs.<br><br>MERCEDES-BENZ USA, LLC,<br><br>   Defendant. | CASE NO. CV 10-05944 MMM (JCx)<br><br>ORDER DENYING DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(B)(1); GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(B)(6); DENYING DEFENDANT'S MOTION TO STRIKE CLASS ALLEGATIONS |

   On August 10, 2010, plaintiff filed this putative class action against Mercedes-Benz, USA, LLC ("MBUSA") claiming (1) violations of California's Consumer Legal Remedies Act (CLRA), California Civil Code § 1750 et seq.; (2) violations of California's Secret Warranty Law, California Civil Code § 1795.90 et seq.; (3) violations of California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200 et seq.; and (4) breach of implied warranty under the Song-Beverly Consumer Warranty Act, California Civil Code §§ 1792 and

1   1791.1 et. seq.[1]   On December 13, 2010, defendant filed a motion to dismiss and/or strike.[2]

2   Plaintiff opposes defendant's motion.[3]

3

4                                    **I.  FACTUAL BACKGROUND**

5          Plaintiff Tigran Cholakyan is a California citizen residing in Los Angeles County,

6   California.[4]   On August 7, 2008, Cholakyan purchased a Certified Pre-Owned 2005 E-320

7   Mercedes Benz, with approximately 28,841 miles on its odometer, from Mercedes-Benz of

8   Calabasas, California.[5]   In January 2010, he parked the vehicle at Burbank Airport before leaving

9   for a weekend trip to Las Vegas.[6]   Upon his return, Cholakyan discovered that it had rained in Los

10  Angeles, and that water had entered and flooded the interior cabin of his vehicle.  Subsequently,

11  in March 2010, the interior cabin of plaintiff's vehicle flooded again.[7]

12         Following the March 2010 incident, Cholakyan brought the vehicle to a Mercedes-Benz

13  authorized dealer, and complained about the water leak and the damage that it had caused.[8]   He

14

15  ───────────────

16      [1]Complaint, Docket No. 1 (Aug. 10, 2010), 1.

17
        [2]Motion to Dismiss Case for Lack of Standing and Failure to State a Claim and to Strike
18  Class Allegations ("Motion"), Docket No. 11 (Dec. 13, 2010); Declaration of Troy Yoshino in
    Support of Motion to Dismiss ("Yoshino Decl."), Docket No. 11 (Dec. 13, 2010); Request for
19  Judicial Notice in Support of Motion ("Mot. RJN"), Docket No. 11 (Dec. 13, 2010).

20
        [3]Opposition to Motion to Dismiss ("Opposition"), Docket No. 19 (Jan. 10, 2011);
21  Declaration of Dara Tabesh in Support fo Opposition ("Tabesh Decl."), Docket No. 19 (Jan. 10,
    2011); Request for Judicial Notion in Support fo Opposition ("Opp. RJN"), Docket No. 21 (Jan.
22  10, 2011).

23
        [4]Complaint, ¶ 17.
24
        [5]*Id.*
25
        [6]*Id.*, ¶ 18.
26
        [7]*Id.*, ¶ 19.
27
        [8]*Id.*, ¶ 20.
28
                                                  2

asserts that the dealer "verified" that the vehicle was experiencing a "water leak defect,"[9] and advised Cholakyan that he would have to pay several hundred dollars, in addition to a diagnostic fee, to repair the water leak defect and resulting damage.[10]  The cost of repairs was not covered under the Certified Pre-Owned vehicle warranty covering the vehicle.[11]

Cholakyan seeks to represent a class of similarly situated persons who purchased or leased certain "defective Mercedes-Benz E-Class vehicles sold by defendant . . . [during] model year[s] 2002 through 2009."[12]  He contends that defendant knew or should have known that the "Class Vehicles" contain one or more design and/or manufacturing defects that cause them to be highly prone to water leaks and flooding, including, but not limited to, defects in the Class Vehicles' water drainage system that is supposed to prevent water from entering the vehicle.[13]  Cholakyan alleges that the Class Vehicles' water drainage system is uniformly and inherently defective in materials, design, and workmanship because it fails to prevent water from entering the interior of the vehicle.[14]

Cholakyan also alleges that the Class Vehicles are inherently defective because the water leaks and water damage cause the vehicles to experience electrical failures.[15]  He asserts that, in light "of the danger of catastrophic engine and/or electrical system failure as a result of water entering and flooding a vehicle's interior cabin while the vehicle is in operation," the Class

---

[9]As explained in paragraph three of plaintiff's complaint, the complaint uses the term "water leak defect" to refer to "one or more design and/or manufacturing defects" that cause Class Vehicles "to be highly prone to water leaks and flooding, including but not limited to defects in the . . .water drainage system, which is designed to prevent water from entering the vehicle during rain or when the vehicle is washed."  (*Id.*, ¶ 3.)

[10]*Id.*, ¶ 20.

[11]*Id.*

[12]*Id.*, ¶ 1.

[13]Complaint, ¶ 3.

[14]*Id.*, ¶ 4.

[15]*Id.*

Vehicles present a safety hazard and are unreasonably dangerous to consumers.  Specifically, Cholakyan contends that "the water leak defect can cause engine failure, suddenly and unexpectedly, at any time and under any driving condition or speed, thereby contributing to traffic accidents, which can result in personal injury or death."[16]

In addition to these safety hazards, Cholakyan asserts that the cost of repairing the water leak defect is exorbitant, since consumers are "required to pay hundreds, if not thousands, of dollars . . . to diagnose and repair the water leak defect and to repair the extensive damage that it causes to a vehicle's electrical system, computer system, and other" parts of the vehicle.[17]  As a result, Cholakyan alleges on information and belief, the Class Vehicles are not fit for their intended purpose of providing consumers with safe and reliable transportation.[18]

Cholakyan contends that defendant actively concealed the water leak defect from him and other putative class members at the time they purchased or leased their vehicles, and at all times thereafter.  He asserts on information and belief that as the number of consumer complaints about the water leak defect began to rise in 2008, defendant issued a secret technical service bulletin ("TSB") to its dealers, acknowledging the water leak defect and implementing cheap, albeit temporary, fixes, such as clearing and/or cleaning the water drainage system, adding seam sealers to parts of the vehicle that are susceptible to the water leak defect, and modifying the Class Vehicles' water drainage system by "[d]ri1l[ing] [an] additional drain hole."[19]  The TSB describes the water leak defect as follows:

> "Water Entry at A-Pillar:[20] If you receive customer reports in the [Class Vehicles]
> of water entry in the driver/front passenger foot well and in some cases

---

[16]*Id.*, ¶ 5.

[17]*Id.*, ¶ 6.

[18]*Id.*, ¶ 7.

[19]*Id.*, ¶ 8.

[20]The A-Pillars are vertical pillars, which make up part of the car frame, located on the left and right side of the windshield.  (Opposition at 2.)

accompanied with electrical faults due to water in the control units, this may be caused by a few different issues. . . .  (2) Blocked water drain in the upper longitudinal member[21] under the front fender (blocked by debris). . . .  (3) Rising water penetrates the interior compartment because of a lack of seam sealer on the double panel of the firewall/longitudinal member on the inside at the top. . . .  (4) Mounting hole for the tilting/sliding roof drain hose, water may back up and overflow into interior. . . .[22]

The TSB directs MBUSA dealers to perform the clearing, cleaning, resealing, and drainage system modification at no cost to consumers under warranty.[23]  Cholakyan contends, however, that the "clandestine, free clearing, resealing and drainage system modification" is not available to all customers, but is "strictly limited to the most persistent customers . . . who complain loudly enough, regardless of whether or not their vehicles are covered under MBUSA's warranty."[24] He asserts that, to mollify such customers, defendant implemented "another clandestine program to secretly reimburse or pay for repair costs of those Class Vehicles that suffer from the water leak defect and the related damage it causes," even when the damage occurs outside the vehicle's warranty period.[25]  This second "clandestine program" is also strictly limited to those customers who "continuously persisted and demanded free repairs, modifications, or reimbursements for water-leak-defect-related damage."  He asserts that, although defendant refused to provide cost-free modifications or repairs for him and other prospective class members, it paid for such repairs

---

[21]The longitudinal member is part of the water drainage system located under the hood and front fender.  (*Id.*, ¶ 47 n. 1.)

[22]*Id.*, ¶ 47.

[23]*Id.*, ¶ 9.

[24]*Id.*

[25]*Id.*, ¶ 10.

when demanded by "noisy consumers."[26]

Cholakyan alleges on information and belief that "if defendant's secret, temporary fixes, including the modification of the drainage system, [are] successful, the effect of these fixes only last long enough to ensure that the manifestation of the water leak defect occurs outside of the warranty period[;] . . . they will not permanently remedy the water leak defect."[27]  This, he asserts, leaves consumers with defective vehicles that are "substantially certain" to experience a recurrence of the water leak defect, additional damage, and associated safety hazards.[28]  Cholakyan contends, on information and belief, that defendant is aware that resealing and water drainage system modification does not fix the water leak defect; rather, he asserts, defendant has implemented these temporary fixes to prolong the amount of time that will elapse before the water leak defect again manifests itself, thus helping to ensure that the water leak defect occurs outside of the warranty period and shifting financial responsibility for the water leak defect to Class Members and their insurers.[29]

Cholakyan alleges that, although defendant received notice of the water leak defect from "numerous consumer complaints and dealership repair orders," it did not offer customers a suitable repair or replacement free of charge,  nor to reimburse class members for costs they incurred diagnosing and repairing water damage.[30]  He contends that defendant knew and concealed the defects present in every Class Vehicle, together with the attendant safety problems and repair costs, both at the time of sale and thereafter.[31]  He maintains that, had he and other class members known of the defects at the time they purchased or leased their vehicles, they would

---

[26]*Id.*, ¶ 11.

[27]*Id.*, ¶ 12.

[28]*Id.*

[29]*Id.*, ¶ 13.

[30]*Id.*, ¶ 14.

[31]*Id.*, ¶ 15.

1   not have purchased or leased, or would have paid a lesser price to take the defects into account.[32]

2   As a result, he asserts, class members have "suffered ascertainable loss of money, property,

3   and/or value of their Class Vehicles."[33]   In addition, he maintains that class members have

4   suffered damage as a consequence of continuous, progressive, and repeated problems associated

5   with the water leaks.[34]

## II.  DISCUSSION

### A.    Legal Standard Governing Motions To Dismiss Under Rule 12(b)(1)

A party mounting a Rule 12(b)(1) challenge to the court's jurisdiction may do so either on the face of the pleadings or by presenting extrinsic evidence for the court's consideration.  See *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Rule 12(b)(1) jurisdictional attacks can be either facial or factual"); *Thornhill Publishing co. v. General Tel. & Electronics*, 594 F.2d 730, 733 (9th Cir. 1979) (facial attack); *Meliezer v. Resolution Trust Co.*, 952 F.2d 879, 881 (5th Cir. 1992) (challenge based on extrinsic evidence).  Whatever the nature of the challenge, plaintiff bears the burden of demonstrating that the court has subject matter jurisdiction to hear the action. See *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989).

There is an important difference between Rule 12(b)(1) motions attacking the complaint on its face and those that rely on extrinsic evidence.  In ruling on the former, courts must accept the allegations of the complaint as true.  See *Valdez v. United States*, 837 F. Supp. 1065, 1067 (E.D. Cal. 1993), aff'd., 56 F.3d 1177 (9th Cir. 1995).  In deciding the latter, courts may weigh the evidence presented, and determine the facts in order to evaluate whether they have the power to hear the case.  See *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).  The "court may not[, however,] resolve genuinely disputed facts where 'the question of jurisdiction is

---

[32]*Id.*

[33]*Id.*

[34]*Id.*, ¶ 16.

7

1   dependent on the resolution of factual issues going to the merits.'"  *Id.* (quoting *Augustine v.*

2   *United States*, 704 F.2d 1074, 1077 (9th Cir. 1983)).  See also *Rosales v. United States*, 824 F.2d

3   799, 803 (9th Cir. 1987) ("A district court may hear evidence and make findings of fact necessary

4   to rule on the subject matter jurisdiction question prior to trial, if the jurisdictional facts are not

5   intertwined with the merits").

6       Where jurisdiction is intertwined with merits, "the district court [must] assume[ ] the truth

7   of the allegations in a complaint . . . unless controverted by undisputed facts in the record,"

8   *Roberts*, 812 F.2d at 1177, or treat the motion as a motion for summary judgment, *Careau Group*

9   *v. United Farm Workers*, 940 F.2d 1291, 1293 (9th Cir. 1991) ("where jurisdiction is so

10  intertwined with the merits that its resolution depends on the resolution of the merits, 'the trial

11  court should employ the standard applicable to a motion for summary judgment'").  See also

12  *Islands, Inc. v. United States Bureau of Reclamation*, 64 F.Supp.2d 966, 968 (E.D. Cal. 1999)

13  ("A court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or

14  Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined

15  with the merits of the case"), vacated on other grounds, 2001 WL 503478 (9th Cir. May 11,

16  2001); *Laurence v. United States*, No. C-93-0381-DLJ, 1993 WL 266657, *2 (N.D. Cal. July 8,

17  1993) (same).

18              **1.      Legal Standard Governing Standing in Federal Courts**

19      The standing doctrine ensures that a litigant is the proper party to bring an action by asking

20  if that litigant has a sufficient stake in the matter to invoke federal judicial process.  To establish

21  Article III standing, "a plaintiff's complaint must establish that he has a 'personal stake' in the

22  alleged dispute, and that the alleged injury suffered is particularized as to him."  *Raines v. Byrd*,

23  521 U.S. 811, 819 (1997).  The plaintiff has the burden "of establishing the three elements of

24  Article III standing: (1) that plaintiff[ ] . . . suffered an injury in fact that was concrete and

25  particularized, and actual or imminent; (2) that the injury is fairly traceable to the challenged

26  conduct; and (3) that the injury was likely to be redressed by a favorable court decision."  *Levine*

27  *v. Vilsack*, 587 F.3d 986, 991-992 (9th Cir. 2009).  Each of these elements "must be supported

28  in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with

8

the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  See also *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180 (2000) (explaining that to satisfy the standing requirements of Article III, a plaintiff must show, *inter alia*, that it has suffered "an 'injury in fact' that is . . . concrete and particularized and . . . not conjectural or hypothetical"); *Smelt v. County of Orange*, 447 F.3d 673, 682 (9th Cir. 2006) ("The burden of showing that there is standing rests on the shoulders of the party asserting it"); *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) ("The party invoking federal jurisdiction, not the district court, bears the burden of establishing Article III standing").  See also *Warth v. Seldin*, 422 U.S. 490, 518 (1975) ("It is the responsibility of the complainant [at the pleadings stage] clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers").

In the class action context, "[t]he Lead Plaintiff['s] individual standing is a threshold issue." *In re VeriSign, Inc.*, No. C 02-02270 JW(PVT), 2005 WL 88969, *4 (N.D. Cal. Jan. 13, 2005) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes a requisite of a case or controversy with the defendant, none may seek relief on behalf of herself or himself or any other member of the class"); *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) ("[O]ur law makes clear that 'if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class,'" citing *O'Shea*, 414 U.S. at 494).  See also *Cornett v. Donovan*, 51 F.3d 894, 897 n. 2 (9th Cir. 1995) ("[I]f the representative parties do not have standing, the class does not have standing").

### 2.     Legal Standard Governing Standing Under the CLRA and UCL

In addition to the "'irreducible constitutional minimum of standing,'" *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102-03 (1998) (quoting *Lujan*, 504 U.S. at 560), plaintiff must satisfy particular requirements to assert claims under the CLRA and UCL.  "In order to establish standing [to assert a] CLRA claim [a] Plaintiff[ ] must establish [ that he] suffered an

actual injury as a result of [defendant's] alleged conduct." *Contreras v. Toyota Motor Sales USA, Inc.*, No. C 09-06024 JSW, 2010 WL 2528844, *4 (N.D. Cal. Jun. 18, 2010) (citing *Birdsong v. Apple, Inc.*, 590 F.3d 955, 959-60 (9th Cir. 2009); and *Aron v. U-Haul Co. of California*, 143 Cal.App.4th 796, 802 (2006)). In addition, "California requires a plaintiff suing under the CLRA for misrepresentations in connection with a sale to plead and prove she relied on a material misrepresentation." *Brownfield v. Bayer Corp.*, No. 2:09-cv-00444-JAM-GGH, 2009 WL 1953035, *3 (E.D. Cal. July 6, 2009) (citing *Caro v. Procter & Gamble Co.*, 18 Cal.App.4th 644, 668 (1993)**).**

"To establish standing under the Section 17200 claim, Plaintiffs must show they suffered an injury in fact and have lost money or property as a result of the alleged unfair competition." *Contreras*, 2010 WL 2528844 at *4 (citing *Aron*, 143 Cal.App.4th at 802); see also *Brownfield*, 2009 WL 1953035 at *3 ("The UCL. . .contain[s] specific standing requirements. The UCL prohibits any 'unlawful, unfair or fraudulent business act or practice.' After Proposition 64, Section[ ] 17204. . .of the Business and Professions Code w[as] amended to require plaintiffs to 'have suffered injury in fact and lost money or property as a result of the unfair competition' in order to bring UCL . . . claims. Accordingly, 'after Proposition 64, a person seeking to represent claims on behalf of others must show that (1) she had suffered an actual injury in fact, and (2) such injury occurred as a result of the defendant's alleged unfair competition. . . ,'" citing CAL. BUS. & PROF. CODE §§ 17200, 17203, 17204).

To prevail on a UCL claim, thereofre, a plaintiff must plead and prove "injury in fact." Where such a claim is premised on allegedly misleading communications, California courts require evidence of reliance before they will find that causation and "injury in fact" have been proved. See *In re Tobacco II Cases*, 46 Cal.4th 298, 326 (2009) (holding that a consumer suing a business under the "fraud" prong of the UCL must show actual reliance on the alleged misrepresentation, rather than a mere factual nexus between the business's conduct and the consumer's injury); *Pfizer Inc. v. Superior Court*, 182 Cal.App.4th 622, 630 (2010) (analyzing the impact of Proposition 64 on UCL claims and noting that a plaintiff "proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate *actual reliance* on the allegedly deceptive or

10

1   misleading statements, in accordance with well-settled principles regarding the element of reliance

2   in ordinary fraud actions").

3               **3.      Whether Plaintiff Has Standing to Assert His State Law Claims**

4               Defendant advances two arguments as to why Cholakyan has not suffered injury in fact:

5   (1) he has not alleged that his vehicle manifested the alleged water leak defect, and (2) he has not

6   alleged that he incurred out-of-pocket damages.[35] See *Contreras*, 2010 WL 2528844 at *5 ("First,

7   Plaintiffs do not allege that their vehicles have manifested the alleged defect.   Second . . .

8   Plaintiffs do not allege that they were forced to replace their vehicles after learning of the alleged

9   defect or that they incurred any out-of-pocket damages").

10              The court addresses defendant's second contention first.   Cholakyan alleges that he took

11  his vehicle to a Mercedes-Benz dealer in March 2010 after water entered the interior of the car.[36]

12  He asserts that the dealer confirmed that his vehicle suffered from the water leak defect,[37] and

13  advised him that he "would have to pay several hundred more dollars than he had already paid to

14  repair the water leak and the damage it had caused."[38]   In response to defendant's assertion that

15  he suffered no "out-of-pocket damages," Cholakyan has produced the receipt he received from

16  the Mercedes authorized dealership in March 2010.[39]   This receipt reveals that he paid $136.00

17  to have the water leak in his vehicle diagnosed.[40]   It also reveals that Cholakyan declined to have

18  the defect repaired.   Defendant contends the fact that Cholakyan's out-of-pocket expenses concern

19  diagnosis, rather than repair, of the alleged defect is fatal to his claim.[41]   It cites no authority for

20

---

21      [35]Motion at 5.

22      [36]Complaint, ¶¶ 20-22.

23      [37]*Id.*, ¶ 21.

24      [38]*Id.*, ¶ 22.

25      [39]Tabesh Decl., Exh. B.

26      [40]*Id.* at 2.

27      [41]Reply in Support of Motion ("Reply"), Docket No. 23 (Jan. 26, 2011).

28

1   this proposition, however, nor does it appear to be an accurate statement of the law.  Cholakyan

2   need only allege that he suffered a concrete financial loss to demonstrate actual injury in fact.  See

3   *Steele v. Hospital Corp. of America*, 36 F.3d 69, 71 (9th Cir. 1994) (allegations of a "concrete

4   financial loss" suffice to confer standing).  See also *Sanchez v. Wal-Mart Stores, Inc.*, No.

5   2:06-CV-2573 JAM KJM, 2008 WL 3272101, *3 (E.D. Cal. Aug. 6, 2008) ("To have standing

6   under the UCL Sanchez need only demonstrate that she spent or lost money due to an unfair

7   business practice.  Direct victims of an unfair business practice may obtain an order of restitution

8   to recover money lost from an unfair practice as well as injunctive relief.  Through this action,

9   Sanchez seeks an order of restitution to recover money lost from having to replace an allegedly

10  defective stroller that she purchased from Wal-Mart due to an unfair business practice. . . .  This

11  is minimally sufficient to confer standing to assert a claim for relief under the UCL").

12  Accordingly, since plaintiff incurred a concrete financial loss, in the form of ascertainable out-of-

13  pocket damages, plaintiff has demonstrated an injury-in-fact under both California and federal law.

14      Turning to defendant's remaining contention, as noted, Article III standing requires injury

15  which is "*fairly traceable* to the challenged conduct."  *Levine*, 587 F.3d at 991-992 (emphasis

16  added).  The gravamen of Cholakyan's complaint is that defendant knew the Class Vehicles had

17  a water leak defect, as outlined in the TSB, and defrauded customers by failing to disclose that the

18  vehicles were prone to water leaks and flooding, and that the defect posed safety concerns for

19  operators of the vehicles.  He also alleges that customers who constantly complained were treated

20  differently than he and members of the putative class in terms of the type of repair or modification

21  services defendant provided.  To have standing to assert UCL and CLRA claims based on these

22  allegations, therefore, Cholakyan must allege that his vehicle experienced the water leak defect

23  described in the TSB.

24      The TSB describes "water entry" at the A-Pillars – the car frame parts located on either

25  side of the windshield – and advises dealers that if they receive customer complaints of "water

26  entry in the driver/front passenger foot well . . . this may be caused by a few different issues. . . .

27

28

(2) Blocked water drain in the upper longitudinal member[42] under the front fender (blocked by debris). . . . (3) Rising water penetrates the interior compartment because of a lack of seam sealer on the double panel of the firewall/longitudinal member on the inside at the top. . . [and] (4) Mounting hole for the tilting/sliding roof drain hose, water may back up and overflow into interior. . . ."[43]

Defendant contends that plaintiff's "only leaks were through other perimeter seals – *not* through the A-Pillar drains," and that leaks through the A-Pillar would manifest as water leaking through the windshield.[44]   It proffers no evidence that compels this conclusion, however, and the court notes that the portion of the TBS quoted in the complaint that concerns A-Pillar leaks mentions that leaks through the foot well can have other causes.   This suggests that at least one cause of foot well water may be leaking through the A-Pillar.   Cholakyan experienced leaking in the foot well; the service order for his vehicle states "cust[omer] says when opening drivers door water rushed out."[45]   The service order also states that the mechanic who serviced Cholakyan's vehicle diagnosed a failure of the "LIC seal" and "driver's door seal."[46]   The driver's door seal would appear, at least in part, to seal the door to the A-Pillar near the front area of the door and window; thus, even if defendant is correct that A-Pillar leaks manifest only around the windshield – which the court cannot determine from information presently in the record – Cholakyan's vehicle experienced a leak in that very area.

At least at this stage of the litigation, the court concludes that Cholakyan has made an adequate showing that he experienced the defect alleged in the complaint, and thus suffered injury in fact fairly traceable to defendant's conduct.   See *In re Toyota Motor Corp. Unintended*

---

[42]The longitudinal member is part of the water drainage system located under the hood and front fender.  (*Id.*, ¶ 47 n. 1.)

[43]*Id.*, ¶ 47.

[44]Motion at 2.

[45]Tabesh Decl., Exh. A.

[46]*Id.*

*Acceleration Marketing, Sales Practices, and Products Liability Litig.*, __ F.Supp.2d __, 2010 WL 4867562, *6 (C.D. Cal. Nov. 30, 2010) ("Standing merely requires a redressable injury that is fairly traceable to Defendants' conduct. Whether a plaintiff can recover for that injury under a particular theory of liability is a separate question. Here, Plaintiffs allege economic loss injuries, which may or may not be recoverable under Plaintiffs' claims in the MCC. These alleged economic injuries are sufficient"). Consequently, for the present, Cholakyan has met his burden of demonstrating that the court has subject matter jurisdiction to hear the action. See *Kokkonen*, 511 U.S. at 377; *Stock West, Inc.*, 873 F.2d at 1225.[47]

## B. Standard Governing Motions to Dismiss Under 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

The court need not, however, accept as true unreasonable inferences or legal conclusions cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 540 U.S. 544, 553–56 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

---

[47]As noted, plaintiff bears the burden of proving that he has standing to sue at all stages of the litigation "'with the manner and degree of evidence required at the successive stages of the litigation.'" *Lopez v. Candaele*, __ F.3d __, 2010 WL 5128266, *5 (9th Cir. Dec. 16, 2010) (quoting *Lujan*, 504 U.S. at 561).

1    inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct.

2    1937, 1949 (2009); see also *Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to

3    raise a right to relief above the speculative level, on the assumption that all the allegations in the

4    complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret*

5    *Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss,

6    the non-conclusory 'factual content,' and reasonable inferences from that content, must be

7    plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

### C.    The Heightened Pleading Requirements of Rule 9(b)

9        The parties agree that Cholakyan's UCL and CLRA claims "sound in fraud," and are

10   therefore subject to the heightened pleading requirement of Rule 9(b) of the Federal Rules of Civil

11   Procedure.  See *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003) ("In

12   cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to

13   allege in the complaint that the defendant has engaged in fraudulent conduct.  In some cases, the

14   plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of

15   conduct as the basis of a claim.  In that event, the claim is said to be 'grounded in fraud' or to

16   'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity

17   requirement of Rule 9(b)"); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir.1996)

18   ("We now clarify that the particularity requirements of Rule 9(b) apply to claims brought under

19   Section 11 [of the 1933 Securities Act] when, as here, they are grounded in fraud").

20       Rule 9(b) requires that the facts constituting the fraud be pled with specificity.  Conclusory

21   allegations are insufficient. FED.R.CIV.PROC. 9(b); *Moore v. Kayport Package Exp., Inc.*, 885

22   F.2d 531, 540 (9th Cir. 1989) ("A pleading is sufficient under Rule 9(b) if it identifies the

23   circumstances constituting fraud so that a defendant can prepare an adequate answer to the

24   allegations.  While statements of the time, place and nature of the alleged fraudulent activities are

25   sufficient, mere conclusory allegations of fraud are insufficient").  See also *Walling v. Beverly*

26   *Enters.*, 476 F.2d 393, 397 (9th Cir. 1973) (concluding that allegations stating the time, place,

27   and nature of allegedly fraudulent activities meet Rule 9(b)'s particularity requirement).

28       Rule 9(b) "does not require nor make legitimate the pleading of detailed evidentiary

1  matter." All that is necessary is "identification of the circumstances constituting fraud so that the

2  defendant can prepare an adequate answer from the allegations." *Walling*, 476 F.2d at 397

3  (alleging in conclusory fashion that defendant's conduct was fraudulent was not sufficient under

4  Rule 9(b)). See also *Miscellaneous Serv. Workers Local # 427 v. Philco-Ford Corp.*, 661 F.2d

5  776, 782 (9th Cir. 1981) (holding that Rule 9(b) requires a pleader to set forth the "time, place

6  and specific content of the false representations as well as the identities of the parties to the

7  misrepresentation").

8                **1.**        **Legal Standard Governing UCL Claims**

9          Under the UCL, any person or entity that has engaged, is engaging, or threatens to engage

10  "in unfair competition may be enjoined in any court of competent jurisdiction." CAL. BUS. &

11  PROF. CODE §§ 17201, 17203. "Unfair competition" includes "any unlawful, unfair or fraudulent

12  business act or practice and unfair, deceptive, untrue or misleading advertising." *Id.*, § 17200.

13  The California Supreme Court has construed the term broadly. See *Cel-Tech Communications,*

14  *Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999) ("[Section 17200] defines

15  'unfair competition to include any unlawful, unfair or fraudulent business act or practice. . . . Its

16  coverage is sweeping, embracing anything that can properly be called a business practice and that

17  at the same time is forbidden by law. . . . By proscribing any unlawful business practice, section

18  17200 borrows violations of other laws and treats them as unlawful practices that the unfair

19  competition law makes independently actionable. . . . However, the law does more than just

20  borrow. The statutory language referring to any unlawful, unfair or fraudulent practice . . .

21  makes clear that a practice may be deemed unfair even if not specifically proscribed by some other

22  law. Because Business and Professions Code section 17200 is written in the disjunctive, it

23  establishes three varieties of unfair competition – acts or practices which are unlawful, or unfair,

24  or fraudulent" (internal quotations omitted)); see also *Paulus v. Bob Lynch Ford, Inc.*, 139

25  Cal.App.4th 659, 676-77 (2006) ("The purpose of the UCL 'is to protect both consumers and

26  competitors by promoting fair competition in commercial markets for goods and services. . . .'

27  Thus, the scope of the UCL (Bus. & Prof. Code, § 17200 et seq.) is 'broad.' It 'covers a wide

28  range of conduct'" (citations and footnote omitted)).

1

### 2.    Legal Standard Governing CLRA Claims

2      The Consumers Legal Remedies Act ("CLRA") makes illegal various "unfair methods of

3 competition and unfair or deceptive acts or practices undertaken by any person in a transaction

4 intended to result or which results in the sale or lease of goods or services to any consumer."

5 CAL. CIV. CODE § 1770(a).  Conduct that is "likely to mislead a reasonable consumer" violates

6 the CLRA.  *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663, 680 (2006) (quoting

7 *Nagel v. Twin Laboratories, Inc.*, 109 Cal.App.4th 39, 54 (2003)).  A "reasonable consumer" is

8 "the ordinary consumer acting reasonably under the circumstances," who "is not versed in the art

9 of inspecting and judging a product, [or] in the process of its preparation or manufacture. . . ."

10 *Id.* (citing 1A CALLMANN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 5:17(4th

11 ed.2004)).

12      Section 1770(a)(3) prohibits "[m]isrepresenting the affiliation, connection, or association

13 with, or certification by, another," while § 1770(a)(4) bans the use of "deceptive representations

14 or designations of geographic origin in connection with goods or services."  The CLRA is to be

15 "liberally construed and applied to promote its underlying purposes, which are to protect

16 consumers against unfair and deceptive business practices and to provide efficient and economical

17 procedures to secure such protection."  *Colgan*, 135 Cal.App.4th at 680.

18

### 3.    Whether Plaintiff Has Stated a UCL or CRLA Claim[48]

19      Plaintiff predicates his UCL and CLRA claims on defendant's allegedly knowing and

20 intentional failure to disclose to class members that, as a result of the water leak defect, the Class

21 Vehicles were "defectively designed and/or manufactured, would fail prematurely, and were not

22 suitable for their intended use."[49]  He also complains of defendant's purported representation that

23 the Class Vehicles were "of a particular standard, quality, or grade when," when in fact they were

24

25

---

26      [48]Defendant mounts a single set of challenges to plaintiff's UCL and CRLA claims,

27 denominating them "plaintiff's fraud-based claims."  (Motion at 8.)

28      [49]Complaint, ¶ 101.

1    of another.[50]  Cholakyan contends that defendant's unfair and deceptive acts or practices occurred

2    repeatedly and were thus capable of deceiving a substantial portion of the purchasing public.[51]

3            "Under California law, there are four circumstances in which an obligation to disclose may

4    arise: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the

5    defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the

6    defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes

7    partial representations but also suppresses some material facts."  *Smith v. Ford Motor Co.*, __

8    F.Supp.2d __, 2010 WL 3619853, *4 (N.D. Cal. Sept. 13, 2010) (citing *Limandri v. Judkins*, 52

9    Cal.App.4th 326, 337 (1997)); and *Cirulli v. Hyundai Motor Co.*, No. SACV 08-0854 AG

10   (MLGx), 2009 WL 5788762, *3 (C.D. Cal. June 12, 2009) ("In *Falk*, the Northern District of

11   California found that concealment or a failure to disclose can constitute actionable fraud under the

12   CLRA in four situations: (1) when the defendant is in a fiduciary relationship with the plaintiff;

13   (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3)

14   when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant

15   makes partial representations but also suppresses some material fact," citing *Falk v. Gen. Motors

16   Corp.*, 496 F.Supp.2d 1088, 1095 (N.D. Cal. 2007) (quoting *Limandri*, 52 Cal.App.4th at 327)).

17          Cholakyan does not allege that he has a fiduciary relationship with defendant, nor that

18   defendant made a partial representation.  Rather, he contends that defendant had exclusive

19   knowledge of material facts, which it actively concealed from him and other putative class

20   members.[52]  The facts within defendant's knowledge that were concealed must be material.  See,

21   e.g., *Ostreicher v. Alienware Corp.*, 544 F.Supp.2d 964, 970-71 (N.D. Cal. 2008) (citing four

22   *Limandri* factors and stating "[t]he first condition is not in issue here.  A]ll of the other situations

23   require materiality"),  aff'd, *Ostreicher v. Alienware Corp.*, 322 Fed. Appx. 489 (9th Cir. 2009).

24   "[I]n order for non-disclosed information to be material, a plaintiff must show that 'had the

25   _____

26          [50]*Id.*, ¶ 82.

27          [51]*Id.*, ¶ 83.

28          [52]Opposition at 13.

18

omitted information been disclosed, one would have been aware of it and behaved differently.'" *Ostreicher*, 544 F.Supp.2d at 971 (quoting *Falk*, 496 F.Supp.2d at 1095, in turn quoting *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1093 (1993)). As noted, "[m]ateriality. . .is judged by the effect on a 'reasonable consumer.'" *Id*. (citing *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal.App.4th 1351, 1360 (2003)).

"[W]here, as here, a plaintiff's claim is predicated on a manufacturer's failure to inform its customers of a product's likelihood of failing outside the warranty period, the risk posed by such asserted defect cannot be 'merely' the cost of the product's repair . . . ; rather, for the omission to be material, the failure must pose 'safety concerns.'" *Smith*, 2010 WL 3619853 at *4 (citing *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal.App.4th 824, 835-38 (2006)). "In other words, under California law, and as recently described by the Ninth Circuit: 'A manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue.'" *Id*. (citing *Oestriecher*, 322 Fed.Appx. at 493) (affirming the dismissal of CLRA, UCL and fraudulent concealment claims because plaintiff failed to allege that defendant had 'affirmatively misrepresented its products' or that the alleged defect 'posed a threat to his own safety or the safety of others')). See also *Smith*, 2010 WL 3619853 at *4 ("The California Court of Appeal has held that a manufacturer cannot be found liable under the CLRA for failure to disclose a defect that manifests itself after expiration of the warranty period unless such omission (1) is 'contrary to a representation actually made by the defendant' or (2) pertains to a 'fact the defendant was obligated to disclose,'" quoting *Daugherty*, 144 Cal.App.4th at 835-36).

"Such rule is consistent with the policies underlying California warranty law. As noted in *Daugherty*:

"[V]irtually all product failures discovered in automobiles after expiration of the warranty can be attributed to a 'latent defect' that existed at the time of sale or during the term of the warranty. All parts will wear out sooner or later and thus have a limited effective life. Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular

period of time. . . .  [M]anufacturers . . . can always be said to 'know' that many parts will fail after the warranty period has expired.  A rule that would make failure of a part actionable based on such 'knowledge' would render meaningless time/mileage limitations on warranty coverage." *Daugherty*, 144 Cal.App.4th at 830-31 (quoting *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 250 (2d Cir. 1986) (alterations original)).

"Indeed, as noted by the district court in *Oestreicher*, 'the purpose of a warranty is to contractually mark the point in time during the useful life of a product when the risk of paying for repairs shifts from the manufacturer to the consumer.'" *Smith*, 2010 WL 3619853 at *5 (citing *Oestreicher*, 544 F.Supp.2d at 972, and *Abraham*, 795 F.2d at 250).

"[T]he rule set forth in *Daugherty* is consistent with the general policy stated by the California Supreme Court that although '[a] consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market,' the consumer nevertheless 'can . . . be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.'" *Id.* (citing *Seely v. White Motor Co.*, 63 Cal.2d 9, 18 (1965)).  See also *Berenblat v. Apple Inc.*, Nos. 08-4969 JF (PVT), 09-1649 JF (PVT), 2009 WL 2591366, *5-7 (N.D. Cal. Aug. 21, 2009) (dismissing claims based on an allegedly defective computer component, because "[t]he failure to disclose a defect that might, or might not, shorten the effective life span of [a product] that functions precisely as warranted throughout the terms of the express warranty" is not actionable); *Morgan v. Harmonix Music Systems, Inc.*, No. C08-5211 BZ, 2009 WL 2031765, *4 (N.D. Cal. July 7, 2009) (dismissing claims based on allegedly defective video game drum pedals because "[a]ccording to all of the relevant case law, defendants are only under a duty to disclose a known defect in a consumer product when there are safety concerns associated with the product's use"); *Wilson v. Hewlett Packard Co.*, No. C-09-2253 RMW, 2009 WL 3021240, *1 (N.D. Cal. Sept. 17, 2009) (dismissing a CLRA claim based on a manufacturer's alleged duty to disclose where the omission did not implicate safety concerns); *Hoey v. Sony Electronics, Inc.*, 515 F.Supp.2d 1099, 1105 (N.D. Cal. 2007) (finding that "[t]here is no authority that provides that the mere sale of a

1  consumer electronics product in California can create a duty to disclose any defect that may occur

2  during the useful life of the product").

3        Here, defendant offered a New Vehicle Limited Warranty, which afforded coverage for

4  the first four years or 50,000 miles of a vehicle's life.[53]  The warranty on Cholakyan's vehicle had

5  expired by the time it experienced the water leak defect.[54]  At that point, the vehicle was covered

6  by a Limited Certified Pre-Owned Vehicle Warranty, which did not cover the cost of repairing

7  the parts involved in the water leak defect in plaintiff's vehicle.[55]  Thus, at the time the water leak

8  defect damaged Cholakyan's vehicle, the parts and labor involved in repairing the vehicle were

9  no longer covered by warranty.  Because Cholakyan's CLRA claim is based on an allegation that

10  defendant had a duty to disclose the water leak defect to him and other class members, it cannot

11  succeed absent evidence of a "safety concern."  See *Daugherty*, 144 Cal.App.4th at 835-38.[56]

12        The TSB instructs dealers that "water entry in the driver/front passenger foot well" is, or

13  may be, "in some cases accompanied with electrical faults due to water in the control units. . . ."[57]

14  Citing this fact, Cholakyan contends that the Class Vehicles present a safety hazard and are

15  unreasonably dangerous to consumers, because "of the danger of catastrophic engine and/or

16  electrical system failure as a result of water entering and flooding a vehicle's interior cabin while

17  the vehicle is in operation."  Specifically, he asserts that "the water leak defect can cause engine

18  failure, suddenly and unexpectedly, at any time and under any driving condition or speed, thereby

19

20       [53]Complaint, ¶ 10 ("Plaintiff . . . alleges that to mollify those consumers who complain

21  loudly enough, Defendant implemented [a] clandestine program to secretly reimburse or pay for
repair costs of those Class Vehicles that suffer from the water leak defect and the related damage

22  it causes . . . even when the water leak defect and the related damage that it causes occurs outside
a vehicle's 4-year/50,000 express warranty period").

23

24       [54]*Id.*, ¶¶ 18, 22.

25       [55]*Id.*

26       [56]There is no allegation that defendant affirmatively misrepresented facts concerning the

27  water leak defect.  See  *Daugherty*, 144 Cal.App.4th at 835.

28       [57]*Id.*, ¶ 47.

1   contributing to traffic accidents, which can result in personal injury or death."[58] Defendant argues

2   that this allegation fails to state a CLRA claim.  It asserts that the purported safety defects are

3   speculative in nature, because there is no allegation that Cholakyan or any other class member

4   ever experienced such a defect.[59]

5          In addition, defendant contends, the National Highway Transportation Safety Authority

6   (NHTSA), "which sets and enforces safety performance standards for motor vehicles and motor

7   vehicle equipment," rejects the notion that defects causing engine stalling necessarily amount to

8   "safety defects."  *Smith*, 2010 WL 3619853 at *7 (noting that NHTSA has consistently denied

9   defect petitions alleging that an ignition lock defect created a safety concern).  See, e.g., Denial

10  of Motor Vehicle Defect Petition, 66 Fed. Reg. 55243 (Nov. 1, 2001) (denying a petition where

11  the reported defect, *inter alia*, "caus[ed] [the] engine to stall").

12         Drawing all inferences in Cholakyan's favor, the court finds defendant's argument

13  unpersuasive at this stage of the litigation.  Cholakyan has not alleged that the water leak defect

14  caused engine stalling; rather, he asserts it causes sudden and unexpected engine failure that could

15  result in personal injury or death.  It is not implausible that the "electrical faults" described in the

16  TSB could give rise to the safety concerns alleged in the complaint.  Courts considering similar

17  allegations have reached this conclusions.  See *Marsikian v. Mercedes Benz USA, LLC*, No. CV

18  08-4876 AHM (JTLx), 2009 U.S. Dist. LEXIS 117012, *16-17 (C.D. Cal. May 4, 2009)

19  (denying a motion to dismiss a CLRA claim where plaintiff alleged that Mercedes-Benz air intake

20  systems were "susceptible to clogging" and that the defect could lead to "substantial electrical

21  failure," because "it is not implausible that the [clogging] would cause 'catastrophic engine and

22  electrical system failure' while the car is on the road"); *Erlich v. BMW of North America, LLC*,

23  No. CV 10-1151 ABC (PJWx), *15 (C.D. Cal. Aug. 11, 2010) (denying a motion to dismiss a

24  CLRA claim where "Plaintiff has alleged that he was injured by the defective windshields by

25  having to replace the cracked windshield in his MINIs twice. . . .  The alleged unreasonable risk

26  _____

27     [58]*Id.*, ¶ 5.

28     [59]Motion at 11.

of safety created by compromised windshields during rollover accidents is relevant to the materiality of BMW's omissions, and Plaintiff has alleged a plausible unreasonable safety risk that would have been material to the reasonable consumer," citing *Marsikian*, 2009 U.S. Dist. LEXIS 117012 at *16-17).[60]

The cases upon which defendant relies do not compel a contrary result. In *Smith*, the court concluded that the alleged defect – the failure of vehicles' automatic ignition locks – was a security risk rather than a safety concern, since the principal risk plaintiff identified was being unable to start the vehicle and being stranded in an unsafe location. 2010 WL 3619853 at *9 ("Having considered the parties' respective evidentiary showings and the applicable law, the Court agrees with Ford that the dangers envisioned by plaintiffs are speculative in nature, deriving in each instance from the particular location at which the driver initially has parked the vehicle and/or the driver's individual circumstances. Plaintiffs offer no evidence that the ignition-lock defect causes engines to shut off unexpectedly or causes individuals to stop their vehicles under dangerous conditions").

In *Daugherty*, the court dismissed plaintiff's claims precisely because the complaint *did not*

---

[60]At the hearing on defendant's motion, MBUSA argued that plaintiff had failed to allege the water leak defect with sufficient specificity because the complaint pleads that there are "one or more design and/or manufacturing defects" that cause Class Vehicles "to be highly prone to water leaks and flooding, including but not limited to defects in the . . . water drainage system, which is designed to prevent water from entering the vehicle during rain or when the vehicle is washed." (*Id.*, ¶ 3.) MBUSA contended the Class Vehicles do not have a water drainage system – although it proffers no judicially noticeable support for this claim – and therefore that plaintiff's reference to defects in the water drainage system is insufficient as a matter of law. The court disagrees. Plaintiff is not required to plead the mechanical details of an alleged defect in order to state a claim. This conclusion is underscored by the court's decision in *Erlich*, where allegations of an unspecified "design flaw that caused the windshield in those vehicles to have a high propensity to crack or chip under circumstances that would not cause non-defective windshields to similarly fail" were found to be sufficient to state a claim. *Erlich*, No. CV 10-1151 ABC (PJWx) at *15. Likewise, in *Marsikian*, the court found plaintiff's allegation that class vehicles had a "defective air intake system," which was part of the "climate control system," sufficient to state a claim. *Marsikian*, 2009 U.S. Dist. LEXIS 117012 at *16-17. Plaintiff's allegation is as specific as these allegations, and must be accepted as true at this stage of the proceedings. The court therefore finds that the defect is adequately pled at this stage.

allege a safety defect.  See *Daugherty*, 144 CalApp.4th at 836 ("Daugherty claims the complaint alleges Honda's knowledge of 'unreasonable risk' to plaintiffs at the time of sale, but the 'unreasonable risk' alleged is merely the risk of 'serious potential damages' – namely, the cost of repairs in the event the defect ever causes an oil leak.  The sole allegation mentioning 'safety' is the paragraph claiming punitive damages, and that paragraph merely asserts a legal conclusion: that Honda's conduct was 'carried on with a willful and conscious disregard for the safety of Plaintiffs and others, entitling Plaintiffs to exemplary damages under Civil Code § 3294'").  Here, by contrast, Cholakyan has alleged electrical faults and engine failures that could result in personal injury or death.

Nor does the case law defendant cites suggest that the safety defect alleged in the complaint is speculative in nature.  *Tietsworth v. Sears, Roebuck & Co.*, 720 F.Supp.2d 1123 (N.D. Cal. 2010), examined plaintiff's allegations of a safety defect in a different context; namely, in order to assess whether plaintiff had alleged injury in fact.  See *Erlich*, No. CV 10-1151 ABC (PJWx) at *15 ("BMW points out that Plaintiff has not alleged that the defective windshields have actually caused injuries in any rollover accidents, relying on *Tietsworth v. Sears, Roebuck & Co.*  BMW further speculates that injuries would not occur unless an owner makes a conscious decision to drive a MINI with a cracked windshield and then gets into a rollover accident.  The Court is not persuaded by *Tietsworth* or BMW's arguments that Plaintiff must plead that consumers have been injured by the alleged unreasonable safety risk.  *Tietsworth* approached the safety defect issue in terms of actual injury to the named plaintiffs, finding that they 'lacked standing' to pursue their claims based on merely posited injuries").  Here, because Cholakyan has alleged actual injury sufficiently at this stage of the litigation, *Tietsworth* is inapposite.

In *Birdsong v. Apple, Inc.*, 590 F.3d 955 (9th Cir. 2009), plaintiffs challenged the safety of Apple's iPod, claiming that "(1) the iPod is *capable* of playing 115 decibels of sound; (2) consumers *may* listen at unsafe levels; and (3) iPod batteries can last 12 to 14 hours and are rechargeable, giving users the *opportunity* to listen for long periods of time."  *Id*. at 958 (emphasis original).  The court opined that, "[t]aken as true, such statements suggest only that users have the option of using an iPod in a risky manner, not that the product lacks any minimum level of

quality." It concluded as a result that plaintiffs had not alleged injury in fact sufficient for Article III standing for this reason. *Id.* at 958-59. Here, as noted, Cholakyan has adequately alleged injury in fact for purposes of Article III standing. More fundamentally, a vehicle with the water leak defect does not function as expected – it cannot be argued, for example, that any car purchaser expects his vehicle's interior to experience periodic flooding. Nor is this a case in which the alleged harm depends on the manner of use of the product, rendering the injury entirely within Cholakyan's or another class member's control. Thus, *Birdsong* too is inapposite.

Because Cholakyan has adequately alleged a safety defect, he has sufficiently pled a material failure to disclose for purposes of the UCL and CLRA. The court therefore denies defendant's motion to dismiss on this basis.[61]

### 4. Whether Plaintiff Has Stated a Claim for Violation of California's Secret Warranty Law

California's Secret Warranty Law provides that "[a] manufacturer shall, within 90 days of the adoption of an adjustment program, subject to priority for safety or emission-related recalls, notify by first-class mail all owners or lessees of motor vehicles eligible under the program of the condition giving rise to and the principal terms and conditions of the program." CAL. CIV. CODE § 1795.92(a); *Smith*, 2010 WL 3619853 at *11. "'Adjustment program' means any program or policy that expands or extends the consumer's warranty beyond its stated limit or under which a

---

[61]Defendant asserts, as an additional ground for dismissal, that plaintiff fails to state a CLRA claim because he did not enter into a transaction with defendant, in that he purchased a certified used vehicle from a Mercedes dealer rather than a new vehicle. (Motion at 13.) California courts have rejected the contention that purchasers of used vehicles have no cause of action against the car's manufacturer. See *McAdams v. Monier, Inc.*, 182 Cal.App.4th 174, 186 (2010) ("We also pause here to note that a cause of action under the CLRA may be established independent of any contractual relationship between the parties," citing *Chamberlan v. Ford Motor Co.*, 369 F.Supp. 2d 1138, 1144 (N.D. Cal. 2005) (stating that "[p]laintiffs who purchased used cars have standing to bring CLRA claims, despite the fact that they never entered into a transaction directly with" the defendant auto manufacturer who manufactured, sold, and distributed automobiles containing an allegedly defective engine part)). Moreover, here, Cholakyan arguably entered into a transaction with Mercedes, given that he alleges that he purchased a Certified Pre-Owned vehicle from Mercedes-Benz of Calabasas, California, and received a limited Certified Pre-Owned warranty from the manufacturer.

1   manufacturer offers to pay for all or any part of the cost of repairing, or to reimburse consumers

2   for all or any part of the cost of repairing, any condition that may substantially affect vehicle

3   durability, reliability, or performance, other than service provided under a safety or emission-

4   related recall campaign. 'Adjustment program' does not include ad hoc adjustments made by a

5   manufacturer on a case-by-case basis." CAL. CIV. CODE § 1795.90(d); *Smith*, 2010 WL 3619853

6   at *11. A remedial strategy designed to resolve customer complaints is not classified as an

7   "adjustment program" if it "expressly requires dealers to make decisions on a 'case-by-case'

8   basis, upon consideration of the circumstances pertaining at the time the customer makes the

9   complaint." *Smith*, 2010 WL 3619853 at *12; *Cirulli*, 2009 WL 5788762 at *6 ("'Adjustment

10  program' *does not include ad hoc adjustments made by a manufacturer on a case-by-case basis*,"

11  citing CAL. CIV. CODE § 1795.90 (emphasis original)).

12  California's Secret Warranty Law "allows consumers who incur expenses for repairing a condition

13  subject to the adjustment program prior to learning of the program to file a claim for

14  reimbursement with the manufacturer." *Morris v. BMW of N. Am., LLC*, No. C 07-02827, 2007

15  WL 3342612, *6 (N.D. Cal. Nov. 7, 2007) (citing CAL. CIV. CODE § 1795.92(d)-(e)).

16          In *Smith*, the court held that an "After Warranty Assistance Program" offered by Ford,

17  which made payments on a case-by-case basis for repairs not covered by any applicable warranty,

18  did not qualify as an "adjustment program" because the program generally "covered repairs where

19  a Ford vehicle was not performing to customer expectations and there [was] an opportunity for

20  increased customer satisfaction and owner loyalty." *Smith*, 2010 WL 3619853 at *2. The court

21  noted that Ford's program was not limited specifically to customers complaining of the defect

22  alleged in the complaint – a malfunctioning of the automatic ignition lock – but rather, applied

23  "generally to all customers who incur after-warranty repair costs." *Id.* at *12. It also found

24  significant the fact that Ford directed its dealers to use discretion in making the program available

25  to particular customers "on a case-by-case basis considering all factors, including past loyalty and

26  the likelihood of favorably influencing the customer's satisfaction and future sales and service

27  intentions." *Id.* For these reasons, the court concluded that Ford's program did not constitute

28  a secret warranty actionable under § 1795.90. *Id.*

1    In *Cirulli*, the court considered whether plaintiff – who was denied warranty coverage for

2    premature corrosion experienced by his Hyundai Sonata – stated a claim under the Secret

3    Warranty Law.  2009 WL 5788762 at *6.  Plaintiff alleged that Hyundai "reflexively denied

4    warranty claims for [some] repairs as untimely, while quietly paying for repairs for the most vocal

5    [c]lass members on a case-by-case basis. . . ."  He also asserted that Hyundai "repaired or

6    replaced certain customers' sub-frames free of charge due to corrosion outside the warranty

7    period, purportedly as a gesture of 'goodwill.'"  *Id*.  The court found that such allegations were

8    squarely at odds with plaintiff's claim that defendant "provides aggrieved Sonata owners with a

9    free replacement sub-frame as part of a 'silent recall' program."  *Id*.  Accordingly, it concluded

10   that he had failed to state a claim under the Secret Warranty Law because he failed to allege facts

11   showing that defendant was operating an adjustment program within the meaning of the law.  *Id*.

12   By contrast, in *Morris*, the court considered whether BMW had violated the Secret

13   Warranty Law where "[t]ires were not covered by BMW's express warranty, but after receiving

14   numerous complaints about premature and uneven wear on these run-flat tires, BMW issued

15   Technical Service Bulletin No. SI B 36 06 06 ('the TSB').  The TSB acknowledged that irregular

16   and premature tire wear [was] occurring, often at less than 10,000 miles.  Plaintiffs allege[d] that

17   under the TSB, BMW offered to pay the full cost of replacing . . . tires experiencing premature

18   or irregular wear prior to 10,000 miles and . . . also offered to pay half the cost of replacement

19   for . . . tires experiencing premature or irregular wear before 20,000 miles."  2007 WL 3342612

20   at *2.  The court concluded that plaintiffs' allegation that BMW adopted a plan specifically to

21   reimburse "purchasers of 3 series automobiles for replacement tires," rather than a more general

22   plan, was sufficient to survive BMW's Rule 12(b)(6) motion.  *Morris*, 2007 WL 3342612 at *2,

23   *6-8.

24   Here, Cholakyan alleges that the TSB was a secret warranty program, which extended class

25   members' warranties beyond their original limits.[62]  Defendant asserts that the plain language of

26   the TSB compels the opposite conclusion; it notes that the TSB directs MBUSA dealers to perform

27   _____

28   [62]Complaint, ¶¶ 59-62.

the clearing, cleaning, resealing, and drainage system modification at no cost to consumers "*under warranty.*"[63]   Defendant is correct that, as alleged in the complaint, the TSB makes no mention of free repairs to vehicles no longer under warranty, but rather informs dealers of the possible causes of, and solutions for, water leak defects in Class Vehicles.   Additionally, Cholakyan expressly alleges that the modification, repair and/or reimbursement program was limited to "the most persistent customers . . . who complain loudly enough."[64]   As in *Cirulli*, therefore, his allegations are squarely at odds with his assertion that defendant implemented an adjustment program.   2009 WL 5788762 at *6.[65]

While the court must, at the pleading stage, draw all inferences in Cholakyan's favor, it need not accept as true unreasonable inferences or legal conclusions cast in the form of factual allegations.   See *Twombly*, 540 U.S. at 553–56 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"); *Iqbal*, 129 S.Ct. at 1949 (stating that the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").   Since Cholakyan has failed to allege facts that would support a finding that

---

[63]*Id.*, ¶ 9 (emphasis added).

[64]*Id.*, ¶ 10; see also *id.*, ¶ 11.

[65]At the hearing, plaintiff's counsel argued the complaint alleges that MBUSA has a blanket policy of providing warranty-type coverage for all customers who complain loudly enough, whether or not their vehicle is covered by MBUSA's express warranty.   In fact, as noted, the complaint alleges that MBUSA does not offer to repair the alleged water leak defect for all customers who complain, but only for "the most persistent customers . . . who complain loudly enough, regardless of whether or not their vehicles are covered under MBUSA's warranty." (Complaint, ¶ 9.)   Because the complaint alleges that repairs are "strictly limited" to MBUSA's most vocal customers, it does not plead that MBUSA had a blanket policy of providing repairs. Indeed, as in *Cirulli*, plaintiff's allegations suggest that repairs are made on an ad hoc basis, and do not support a secret warranty claim as a result.

the TSB extended warranty coverage beyond the original period or constituted an adjustment program, he has failed to meet the pleading requirements of Rule 8, and his secret warranty claim must be dismissed.

### 5.    Whether Plaintiff Has Stated a Claim for Breach of an Implied Warranty Under the Song-Beverly Act

The Song-Beverly Consumer Warranty Act ("Song-Beverly Act") was enacted to regulate warranties and strengthen consumer remedies for breaches of warranty. *National R.V., Inc. v. Foreman*, 34 Cal.App.4th 1072, 1077 (1995). The act is intended to protect purchasers of "consumer goods," defined as "any new product or part thereof that is used, bought, or leased for use primarily for personal, family, or household purposes, except for clothing and consumables." CAL. CIV. CODE § 1791(a). Unless specific disclaimer methods are followed, an implied warranty of merchantability accompanies every retail sale of consumer goods in the state. CAL. CIV. CODE § 1792; see also *Music Acceptance Corp. v. Lofing*, 32 Cal.App.4th 610, 619 (1995).

As defined in the Song-Beverly Act, an implied warranty of merchantability guarantees that "consumer goods meet each of the following: (1) Pass without objection in the trade under the contract description; (2) Are fit for the ordinary purposes for which such goods are used; (3) Are adequately contained, packaged, and labeled; (4) Conform to the promises or affirmations of fact made on the container or label." CAL. CIV. CODE § 1791.1(a). "Unlike express warranties, which are basically contractual in nature, the implied warranty of merchantability arises by operation of law. . . . [I]t provides for a minimum level of quality." *American Suzuki Motor Corp. v. Superior Court*, 37 Cal.App.4th 1291, 1295-96 (1995).

A plaintiff claiming breach of an implied warranty of merchantability must show that the product "did not possess even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure, Inc.*, 114 Cal.App.4th 402, 406 (2003) (citing CAL. COMM. CODE § 2314(2)); see also *Pisano v. American Leasing*, 146 Cal.App.3d 194, 198 (1983) ("Crucial to the inquiry is whether the product conformed to the standard performance of like products used in the trade").

The implied warranty of merchantability set forth in § 1791.1(a) requires only that a

vehicle be reasonably suited for ordinary use, however. Stated differently, it need not be perfect in every detail so long as it "provides for a minimum level of quality." *American Suzuki*, 37 Cal.App.4th at 1296 (quoting *Skelton v. General Motors Corp.*, 500 F.Supp. 1181, 1991, rev'd. on other grounds, 660 F.2d 311 (7th Cir. 1981)); see also 1 White & Summers, Uniform Commercial Code, § 9-8 at 523 (4th ed.1995) ("An item can "pass without objection" and yet be considerably short of perfection"). The basic inquiry, therefore, is whether the vehicle was fit for driving. See *Carlson v. General Motors Corp.*, 883 F.2d 287, 297 (4th Cir.1989) ("Since cars are designed to provide transportation, the implied warranty of merchantability is simply a guarantee that they will operate in a safe condition and substantially free of defects. Thus, where a car can provide safe, reliable transportation, it is generally considered merchantable"), cert. denied, 495 U.S. 904 (1990); *Skelton*, 500 F.Supp. at 1191 ("Automobiles are designed for driving, and therefore the question in this case is whether the GM vehicles at issue were fit for that purpose"); *American Suzuki*, 37 Cal.App.4th at 1296 ("Courts in other jurisdictions have held that in the case of automobiles, the implied warranty of merchantability can be breached only if the vehicle manifests a defect that is so basic it renders the vehicle unfit for its ordinary purpose of providing transportation"); see also 1 White & Summers, Uniform Commercial Code, § 9-8 at 523 ("Although more or less a synonym of 'fit for ordinary purposes,' the 'pass without objection' phrase focuses more clearly on trade usage, similar goods, and on the seller's conduct"); *Mercedes-Benz of North America, Inc. v. Garten*, 94 Md. App. 547, 563, 618 A.2d 233, 240 (Md. App. 1993) (noting that "the car in question was accepted by another Mercedes-Benz dealer as a trade-in" in evaluating whether a 1990 300E "passed without objection in the trade under the contract description").

A vehicle that has been materially damaged will not "pass without objection" in the trade as a "new car." See, e.g., *Thomas v. Ruddell Lease-Sales, Inc.*, 43 Wash. App. 208, 214, 716 P.2d 911, 915 (Wash. App. 1986) ("The evidence demonstrates that a significant segment of the buying public objects to buying a Corvette that has been damaged and repaired. Therefore, a wrecked and repaired Corvette does not pass *without* objection in the trade as a 'used Corvette'" (emphasis original)); see also *Currier v. Spencer*, 299 Ark. 182, 186, 772 S.W.2d 309, 311 (Ark.

1   1989) ("Currier warranted the car to be a one owner 1984 Datsun.  What Spencer purchased was

2   two-thirds of one car and one-third of another [welded together]. . . .  [T]he court [properly]

3   found that the car could not 'pass without objection in the trade under the contract description'");

4   *Luther v. Bud-Jack Corp.*, 72 Misc.2d 924, 926-27, 339 N.Y.S.2d 865, 868 (N.Y. Sup. Ct. 1972)

5   ("Section 2-314 of the Uniform Commercial Code provides that in a sale of a new automobile such

6   as occurred herein, the dealer gives to the purchaser an implied warranty of merchantability,

7   [including] that . . . the automobile would be at least such as would pass without objection in the

8   trade under the contract description. . . .  The jury was instructed that it had to determine,

9   therefore, . . . whether the 1971 Fiat which the plaintiff bought from the defendant complied with

10  the standards of quality which a purchaser would ordinarily be entitled to expect when buying a

11  new car of the same type").   In this regard, California courts "reject the notion that merely

12  because a vehicle provides transportation from point A to point B, it necessarily does not violate

13  the implied warranty of merchantability.  A vehicle that smells, lurches, clanks, and emits smoke

14  over an extended period of time is not fit for its intended purpose." *Isip v. Mercedes-Benz USA,*

15  *LLC*, 155 Cal.App.4th 19, 27 (2007).

16          Whether a car provides a "minimum level of quality" is not determined by the manner in

17  which it is operating at the time of sale.  A vehicle that operates for some time after purchase may

18  still be deemed "unfit for ordinary purposes" if its components are so defective that the vehicle

19  becomes inoperable within an unacceptably short period of time.   See, e.g., *Hornberger v.*

20  *General Motors Corp.*,  929 F.Supp. 884, 888 (E.D. Pa. 1996) ("[A] material question of fact

21  does exist as to whether a normal transmission of a newly leased vehicle would fail after being

22  driven approximately 40,000 miles, rendering the car unfit for the purpose of driving and,

23  therefore, unmerchantable").  Thus, the "'implied warranty of merchantability may be breached

24  by a latent defect undiscoverable at the time of sale,' so '[i]n the case of a latent defect, a product

25  is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of

26  the unseen defect, not by its subsequent discovery.'" *Erlich*, No. CV 10-1151 ABC (PJWx) at

27  *23 (quoting *Mexia v. Rinker Boat Co.*, 174 Cal.App.4th 1297, 1305-06 (2009)).  See also *id.*

28  ("In *Mexia*, the plaintiff brought a claim for breach of the implied warranty of merchantability

under the Song-Beverly Act for a boat he purchased that contained a latent defect causing its engine to corrode.  The plaintiff had purchased the boat on April 12, 2003, and the alleged defect arose in July 2005.  The plaintiff took it an authorized boat dealer for repairs, but the condition persisted and the plaintiff sued on November 27, 2006, for a violation of the Song-Beverly Act.  Citing the statute, the defendants argued that the plaintiff's latent defect claim expired one year after purchase, even though the defect manifested itself two years after purchase.  The court concluded at the demurrer stage that the plaintiff's warranty claim over the alleged latent defect was not barred by the one-year duration provision in the Song-Beverly Act. . . .  The court first rejected the argument because it 'ignores the distinction between unmerchantability caused by a latent defect and the subsequent discovery of the defect; the fact that the alleged defect resulted in destructive corrosion two years after the sale of the boat does not necessarily mean that the defect did not exist at the time of the sale,'" citing *Mexia*, 174 Cal.App.4th at 1301-02, 1304-05, 1308.)

Cholakyan alleges that, although he discovered it three years later, the water leak defect existed at the time of sale.  He also asserts that the defect rendered his vehicle unfit the its intended use.[66]  As defendant notes, however, the complaint contains no allegation that Cholakyan had his vehicle repaired after experiencing the water leak defect.  Defendant argues that this fact is determinative, and demonstrates that Cholakyan's claim fails as a matter of law.  There is some support for this proposition.  See *Mercedes-Benz of North America*, 94 Md. App. at 562, 618 A.2d at 240 ("Mr. Garten put approximately 1800 miles on the car from April to May in 1990.  This is hardly indicative of an individual who considers a car unsafe.  There was no evidence that the car ever failed to start or failed to transport Mr. Garten where he needed to go").

While Cholakyan's failure to allege that he had his vehicle repaired certainly weighs against his ability to recover on the claim, the complaint contains various allegations that, accepted as true, state a implied warranty of merchantability claim.  Specifically, as noted, the complaint alleges that the water leak defect poses "the danger of catastrophic engine and/or electrical system

---

[66]Complaint, ¶¶ 3, 114-121.

1  failure as a result of water entering and flooding a vehicle's interior cabin while the vehicle is in

2  operation. . . ."  It also asserts that "the water leak defect can cause engine failure, suddenly and

3  unexpectedly, at any time and under any driving condition or speed, thereby contributing to traffic

4  accidents, which can result in personal injury or death."[67]  Vehicles subject to engine failure

5  cannot be said to be merchantable.  Cf. *Hornberger*, 929 F.Supp. at 888 ("[A] material question

6  of fact does exist as to whether a normal transmission of a newly leased vehicle would fail after

7  being driven approximately 40,000 miles, rendering the car unfit for the purpose of driving and,

8  therefore, unmerchantable").  See *Erlich*, No. CV 10-1151 ABC (PJWx) at *26 ("BMW also tries

9  to distinguish *Mexia* on its facts, arguing that the plaintiff in that case alleged a latent defect that

10  existed within the one-year time limit, whereas here, Plaintiff cannot claim that his MINI was not

11  merchantable when he bought it because it provided safe and reliable transportation for over three

12  years.  However, Plaintiff has alleged a latent defect in the windshield existed at the time he

13  purchased his MINI, and that the defect eventually caused the windshield to crack over three years

14  after his purchase.  As *Mexia* held, the fact that the alleged defect resulted in a cracked windshield

15  three years after the sale of the MINI 'does not necessarily mean that the defect did not exist at

16  the time of sale.'  Plaintiff has therefore adequately alleged a breach of the implied warranty that

17  satisfies the one-year time period of section 1791.1.12," citing *Mexia*,174 Cal.App.4th at 1308).[68]

18

19     [67]*Id.*, ¶ 5.

20     [68]Defendant contends Cholakyan cannot state a claim for breach of the implied warranty

21  of merchantability because he does not allege that he is in vertical privity with it.  (Motion at 17.)
   This appears to be inaccurate, since the complaint alleges that Cholakyan purchased a Certified

22  Pre-Owned vehicle from Mercedes-Benz of Calabasas, California, with a warranty provided by

23  the manufacturer. (Complaint, ¶ 17.)  Other courts considering similar factual circumstances have
   held that individuals who purchase a vehicle from an authorized dealership can maintain an

24  implied warranty cause of action against the manufacturer as third party beneficiaries.  See *In re*

25  *Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability*
   *Litigation*, __ F.Supp.2d __, 2010 WL 4867562, *30 (C.D. Cal. Nov. 30, 2010) ("[W]here a

26  plaintiff pleads that he or she is a third-party beneficiary to a contract that gives rise to the implied

27  warranty of merchantability, he or she may assert a claim for the implied warranty's breach.
   Here, Plaintiffs have pled that they purchased vehicles from a network of dealers who are agents

28  of Defendants. . . .  'The dealers were not intended to be the ultimate consumers of the Defective

1    Consequently, the court concludes that Cholakyan has met his burden under Rule 8, and

2    denies defendant's motion to dismiss the Song-Beverly Act claim.

3        **D.    Legal Standard Governing Motions to Strike Under Rule 12(f)**

4        Under Rule 12(f), the court may strike "any insufficient defense or any redundant,

5    immaterial, impertinent or scandalous matter." FED.R.CIV.PROC. 12(f).    A motion to strike is

6    properly granted where plaintiff seeks a form of relief that is not available as a matter of law.

7    *Rosales v. Citibank, Federal Savings Bank*, 133 F.Supp.2d 1177, 1180 (N.D. Cal. 2001) ("Under

8    Federal Rule of Civil Procedure 12(f), a party may move to strike 'any redundant, immaterial,

9    impertinent, or scandalous matter.' . . .    This includes striking any part of the prayer for relief

10   when the relief sought is not recoverable as a matter of law"); *Bureerong v. Uvawas*, 922 F.Supp.

11   1450, 1479 n.34 (C.D. Cal. 1996) (". . . a motion to strike may be used to strike any part of the

12   prayer for relief when the damages sought are not recoverable as a matter of law").

13       In ruling on a motion to strike under Rule 12(f), the court must view the pleading in the

14   light most favorable to the nonmoving party.  See *California v. United States*, 512 F.Supp. 36,

15   39 (N.D. Cal. 1981).    Thus, "[b]efore granting such a motion . . . , the court must be satisfied

16   that there are no questions of fact, that the [claim or] defense is insufficient as a matter of law, and

17   that under no circumstance could [it] succeed." *Tristar Pictures, Inc. v. Del Taco, Inc.*, No. CV

18   99-07655 DDP(Ex), 1999 WL 33260839, *1 (C.D. Cal. Aug. 31, 1999).

19           **1.    Whether the Court Should Strike The Class Allegations From Plaintiff's**

20           **Complaint**

21       Defendant argues that Cholakyan's class allegations should be stricken because the putative

22

23

24

25   _____

26   Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles;
     the warranty agreements were designed for and intended to benefit the ultimate consumers only.'

27   . . .    [Plaintiffs therefore] allege facts tending to support that they are third-party beneficiaries;
     therefore, Plaintiffs' breach of implied warranty claim is not precluded by the lack of vertical

28   privity").

class is not ascertainable,[69] he is not a typical or adequate class representative,[70] and the class allegations raise multiple individualized issues.[71]   While defendant cites several cases for the proposition that class allegations can be stricken at the pleadings stage,[72] it is in fact rare to do so in advance of a motion for class certification.  See, e.g., *In re Wal-Mart Stores, Inc. Wage and Hour Litig.*, 505 F.Supp.2d 609, 614-16 (N.D. Cal. 2007) ("the granting of motions to dismiss class allegations before discovery has commenced is rare"); *Moreno v. Baca*, No. CV007149ABC (CWx), 2000 WL 33356835, *2 (C.D. Cal. 2000) (holding that defendants' motion to strike class allegations was premature because no motion for class certification had been filed); *Myers v. MedQuist, Inc.*, No. 05-4608, 2006 WL 3751210, *4 (D. N.J. 2006) (declining to strike class allegations because discovery had not yet commenced and observing that most courts deny such motions if brought prior to discovery); see also 7AA Charles Alan Wright, Arthur R. Miller & Mary K. Kane, FEDERAL PRACTICE AND PROCEDURE CIVIL § 1785.3 (3d 2005) (noting that the practice employed in the overwhelming majority of class actions is to resolve class certification only after an appropriate period of discovery).  See also *In re Saturn L-Series Timing Chain Prods. Liab. Litig.*, No. MDL 1920, 08:07CV298, 08:08CV79, 2008 WL 4866604, *24 (D. Neb. Nov. 7, 2008) ("While Defendants note potential difficulties this Court may face in defining the class, these concerns do not justify a premature dismissal of all class allegations prior to the class certification stage. Defendants' arguments in support of premature dismissal are not persuasive since the cases they cite warranted premature dismissal on grounds that do not exist in this case. Even where 'plaintiffs' class definitions are suspicious and may in fact be improper, plaintiffs should at least be given the opportunity to make the case for certification based on appropriate discovery of, for example, the . . . lists that they claim will identify the class members,'" citing

---

[69]Motion at 18.

[70]*Id.* at 20.

[71]*Id.* at 21.

[72]*Id.* at 17-18.

35

*In re Wal-Mart Stores,* 505 F.Supp.2d at 615); *In re NVIDIA GPU Litig.*, No. C 08-04312 JW, 2009 WL 4020104, *13 (N.D. Cal. Nov. 19, 2009) ("A determination of the ascertainability and manageability of the putative class in light of the class allegations is best addressed at the class certification stage of the litigation"); *Shein v. Canon U.S.A., Inc.*, No. CV-08-07323CASEX,2009 WL 3109721, *10 (C.D. Cal. Sept. 22, 2009) ("The Court finds that these matters are more properly decided on a motion for class certification, after the parties have had an opportunity to conduct class discovery and develop a record"); *In re Jamster Mktg. Litig.*, No. 05CV0819 JM (CAB), 2009 WL 1456632, *7 (S.D. Cal. May 22, 2009) ("Even though the arguments of [the defendant] may ultimately prove persuasive, the court declines to address issues of class certification at the present time.  Piece-meal resolution of issues related to the prerequisites for maintaining a class action do not serve the best interests of the court or parties"); *Rosenberg v. Avis Rent A Car Sys.*, No. CIV A 07-1110, 2007 WL 2213642, *4 (E.D. Pa. July 31, 2007) (noting that defendant had used a motion  to dismiss allegedly vague class action allegations "as an opportunity to attack the merits of the class itself" and concluding that such an attack was improper before a class certification motion had been filed); *Brothers v. Portage Nat'l Bank*, No. Civ. A 306-94, 2007 WL 9655835, *7 (W.D. Pa. Mar. 29, 2007) (explaining that a Rule 12(b)(6) motion must not be used "as a vehicle for preempting a certification motion"); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, No. 06-0715 SC, 2006 WL 3422198, *3 (N.D. Cal. Nov. 28, 2006) (finding that a motion to strike class allegations from a complaint "is an improper attempt to argue against class certification before the motion for class certification has been made and while discovery regarding class certification is not yet complete"); *Cole v. Asurion Corp.*,No. CV 06-6649PSGJTLX, 2008 WL 5423859, *14 (C.D. Cal. Dec. 30, 2008) ("Undoubtedly, addressing these arguments at a later date will require additional time and expense on the part of the defendants.  But the Court is reluctant to preemptively deny Plaintiff at least the opportunity to present a motion for class certification").

Defendant has yet to file an answer and discovery has not begun.  Given the early stage of the proceedings, it is premature to determine if this matter should proceed as a class action. See *In re Wal-Mart Stores*, 505 F.Supp.2d at 615 ("In the absence of any discovery or specific

arguments related to class certification, the Court is not prepared to rule on the propriety of the class allegations and explicitly reserves such a ruling"). Accordingly, the court denies defendant's motion to strike plaintiff's class allegations.

### III.  CONCLUSION

For the reasons stated, the court denies defendant's motion to dismiss under Rule 12(b)(1). Defendant's Rule 12(b)(6) motion to dismiss is granted as to plaintiff's secret warranty claim, and denied as to all other claims.  Defendant's motion to strike plaintiff's class allegations is denied. Plaintiff may file an amended complaint within twenty days of this order.

DATED: June 30, 2011

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE